This is our next case. Good morning, your honors. May it please the court. Mr. Grau was convicted of unlawful possession of ammunition, one bullet, that was found in an orange plastic toy gun that was incapable of firing any bullet. His defense at trial was that the government failed to prove that he knew this was a real bullet. The evidence supporting this theory included, one, the fact that the bullet was in an obviously fake orange plastic toy gun, Mr. Grau's statement that he had found the plastic gun in the park, and the fact that the police, at first, until they examined it, didn't think any of this was real. The store detective thought it was a water gun, and one of the arresting officers told Mr. Grau that he would probably be released with a D.A.T. Which Mr. Grau responded, not likely, or something along those lines. Right, but we have no idea what that meant. Mr. Grau was a convicted felon. He had a prior record. It may have not been within his experience that he had ever been released with a D.A.T. and didn't think that would happen. But the court excluded defense evidence that directly supported this defense and refused to That's really the question I have. The defense is about his mental state. Right. And, of course, there's no actual direct evidence of his mental state because what he told the police about this is hearsay. He didn't testify. So we're trying to draw inferences about what was in his mind. Exactly. How does the fact that such things as fake bullets exist and are in the marketplace tell us anything about what he thought? There's no evidence as to whether he had ever gone on the Internet, whether he had ever purchased fake bullets, whether he'd ever seen fake bullets. So why does the mere existence of this material tell us something about what's in his head? Why is it relevant? Because the government also had no direct evidence. And they were also relying on an assumption that because it looks real, of course he knew it was real. And so this evidence would have rebutted the assumption to some extent. And we have to remember that the relevant standard only requires that the evidence have some tendency to make a fact of consequence more or less probable than it would be without the evidence. So if what he had in his pocket was a baggie containing what on chemical analysis turns out to be marijuana, which he says he found in the park, you could put on your paralegal to testify, here is a baggie of oregano that I bought in Fairway. And because that would show that there are things that look like marijuana and that people have sometimes sold to cheat customers pretending it's marijuana, that would be relevant, that the existence of oregano is relevant to the mental state of the person. That's a different question because everybody knows that there are other things that could look like marijuana, oregano, or tea. And that could be argued. That could certainly be argued. Whether or not that would be admissible as evidence would be necessary. Maybe it would be admissible. Or maybe, I don't know. That's a different question. What we have here is a situation where the jury, without this evidence, has no reason to know. Some jurors might know, some might not, but that's not in the evidence. That the existence of fake but real looking bullets, that this is a thing, that this exists out there, and that it's widely available. What is the evidence that it actually does exist out there or that these particular items that are in question are in fact fake? Because your predecessor counsel studiously avoided asking the expert, the ATF agent who was on the stand as an expert, to assess these bullets and tell us are these fake or real. And as Judge Hollerstein pointed out, the paralegal is not an expert and can't say whether they're real or not. And as he put it, somewhat cryptically, but I think his point is, there's no authenticity on the Internet. What the evidence is, is that the paralegal bought something that some anonymous website represented was a fake bullet. And that representation is hearsay. Your Honor, the defense counsel did show these bullets to the agent and asked him how he could tell that this wasn't real. Yeah, he said they were judged by the weight. I can't say for sure they're real because of the weight. Right. But there was no actual testimony where he was asked, do what you got to do. Make your assessment and tell me is this real, which might have been useful even as a questioning of the expert's credentials. But either defense counsel didn't think of it or was afraid to do it. Well, I don't think there was any question that there was any fear. I think the defense counsel believed that that's what she was doing. She showed the agent these fake bullets, which were fake. They didn't have the primer stamp and things like that. So she showed him these and she asked him, how could you tell that this is not a real bullet? And he said, well, this one feels light. It looks a little different. It also feels light. So it was just understood that these were fake. That was an oversight, if anything. But the paralegal was going to testify to the fact that she went on Amazon. And the Amazon ads are in the appendix and ordered, and there are multiple ads, ordered for $15 or $18 for six replica bullets. They're sold as replica bullets. They're not real bullets. And that is as much authenticity as required. It's just to show that these are a thing that people can buy. There's a marketplace for these things. And this would have rebutted the evidence that was in the case, which was the government's evidence, that came in on the government's case, which was that, according to Agent Stern, the only fake bullets he had ever seen were fake bullets of the type that law enforcement had, simulation used in police training, or formerly live rounds that had been converted into souvenirs that some officers wore around their necks on necklaces. And he said he'd never even seen these. He'd never even seen the key chain. He's never even seen it. And he is an expert in this, and it's his job to know about bullets and testify in court. Why on earth would we think that Mr. Grau has seen that and has some knowledge that there are marketplaces of fake bullets? Well, because, Your Honor, the defense is not just stuck with whatever the government witnesses say. The defense has a right to put on the floor with it. No, you're not stuck with it, but you just represented that as part of how we're going to assess this. And I'm just asking, why would we think, what other than speculation links what the paralegal bought on Amazon to what Mr. Grau thought he had in his pocket? Well, Your Honor, we argue that we didn't have to show that Mr. Grau knew what the paralegal found or specifically had ordered things or knew. It's just, as in Omanumu, that this defense that he didn't necessarily, he wouldn't have necessarily assumed, finding a bullet that looks real in an obviously fake toy plastic gun, he wouldn't have necessarily assumed that this was a real bullet. That the evidence that this kind of replica bullet is out there, that it's widely available, that it's cheap, and that it's available to the public, not just to police officers, would have furthered the ball to some extent on that defense that you can't just assume that he knew the bullet was real. No. He didn't take the stand, right? He did not. So he didn't put his state of mind in issue? He did not, and there was no direct evidence on either side. But what the government had going for it on its side was that, oh, come on, look at this. Look at the pictures. This is a real bullet. It must be real. In fact, that was its sole argument on the Rule 29 motion. Now, by the time it came along to summation, it added, well, it was modified. He must have known. But there was no evidence that he knew. There was no evidence from the outside. In fact, the government conceded that, you know, you'd have to examine this a bit, but asked the jury to assume that he must have examined it. And there was no evidence for that. From the outside, it just looked like an orange plastic water gun that had some tape around one or two parts. Thank you, Ms. Kastner. You've reserved two minutes for rebuttal. Thank you. Pellegrino. May it please the Court, good morning. My name is Louis Pellegrino. I represent the United States, and I represented the United States in the proceedings below. In the trial court below, there was only one question in dispute, and that is whether the defendant knew that the ammunition he possessed was ammunition within the meaning of the statute. The government's evidence at trial overwhelmingly proved that he did know. Now, the defense suggests that the only argument that the government made in this regard is that the bullet looked real, therefore it must have been real. But the government presented more evidence than that. First, the defendant was arrested at Macy's while carrying a plastic gun modified to be a potentially dangerous weapon. It was not a movie prop. It was not a Halloween costume weapon. It was a plastic gun modified to be something more dangerous. That was evident from its ---- Someone had tried to modify it to make it more dangerous. I take it nothing in the government's brief relies on the testimony of Officer Boyd. Is that right? It does not, Your Honor. However, there's been some discussion ---- Because both your experts said that this was not, in fact, dangerous, that this was a failed attempt to make the gun operate. And the other officer gave a very different account of what happened to the bullet during the packaging of the evidence. Yes, Your Honor. Let me take a couple of those points. One is that it's not correct to say that the officers were not concerned about the dangerousness of the weapon. At A85 in the appellate record, there's a discussion with Officer Caraballo immediately after ---- Once again, there's something of a distinction. One officer is pointing it at the other one, which I hope suggests that he did not think this was a very fearsome item. And the other fellow said, don't point this at me, which, as you fairly argue, suggests that he had a more prudent approach to this item. Right, and we asked him why, and he said it could potentially go off. And I think all of the officers ---- Of course, that's before they examined it. By the time they're done examining it, you'll probably get a DAT and be out of here this afternoon. They're kind of laughing and scratching at what is a pretty ridiculous piece of equipment that this fellow had. I think that's right. However, Special Agent Stern, who was the expert here and testified about the firearm, testified that he was not able to determine whether it was, in fact, a firearm or not. I think he could look at it and see that it was a plastic gun and that it had been modified. But he had to send it to the firearms technology branch in West Virginia to make that definitive assessment. And when ATF did that assessment, Special Agent Stern testified that the assessment was it was, in fact, potentially capable of being a real weapon insofar as it had all the necessary parts or mechanisms to make it a real weapon. And the only reason that it was not was because the firing pin did not strike the bullet with enough force to actually discharge the propellant and shoot the bullet out of the gun, as opposed to just ejecting the entire cartridge out of the gun, which is what happened. So in that regard, it was a sinister device. And if you look at the depiction of the weapon in the record at A347, it's immediately apparent upon looking at the weapon just upon visual inspection that it was a device that had been modified for a more sinister purpose. There's black electrical tape wrapped around the outside of the toy gun. Special Agent Stern testified that the gun also had a longer barrel that had been broken off. I don't know whether Mr. Grau would have noticed that or not, but he certainly would have noticed the .38 special bullet sticking out of the front of the gun rather precariously. And Mr. Grau's defense team adopted the position that at the time he came upon the gun in the park, it was in the condition in which he found it. Which means he would have just picked it up with that ammunition sticking out of the front of it and jammed it in his pocket despite it being wrapped in tape, despite the bullet sticking out of the front like that. And then his defense was, well, I thought it was a movie prop, but that looks nothing like a movie prop, which would have been created to resemble a real firearm. Furthermore, it's important to note the additional evidence that the government provided regarding Mr. Grau's state of mind. And those are Mr. Grau's statements. Mr. Grau made no less than six key post-arrest statements, none of which, by the way, support his contention that he thought it was a toy. Mr. Grau never said, I thought this was fake. Why are you arresting me for a fake gun and a fake bullet? In fact, he said the opposite. He said, it's not mine. He said, I found it in the park. Now, why would he say that? Because he's disclaiming ownership of it. He knows, as a prior convicted felon, and no doubt he was instructed at some point when he was convicted of that prior felony that he, in federal court, you're instructed you can't possess a firearm, destructive device, or ammunition. He received a similar instruction. He knew that possessing this thing, he was going to get in trouble. That's why he said, it's not mine. He told not one but two officers that he found it in the park. And then he said, I was going to turn it in. And the defense says, well, that was just joking. But his next statement about, as Judge Lynch referred to, Officer Caraballo saying, you're going to be out of here in a few minutes. We'll get you processed. You're going to get a DAT or a desk appearance ticket. He said, I just know I'm not going to get a DAT. Officer Caraballo said, why is that? Do you have warrants? He said, I just know I'm not going to get a DAT. That's all powerful evidence of his guilty state of mind because he knew that he was not. Maybe relevant evidence of his guilty state of mind. Powerful is pushing it. I assume from the fact that you're going to all this trouble with this guy that he must have some kind of substantial criminal history. And might not that be a reason why he thought he wasn't going to get a desk appearance ticket? Is that even for a trivial crime, such a crime by him might be taken more seriously? These are inferences that people can draw, but let's not get carried away with how overwhelming they are. Fair enough, Your Honor. Still, the jury was presented with circumstantial evidence that they considered. That evidence was presented to them throughout the trial and then discussed at closing. And why is it such a big problem to let the defense put on their circumstantial evidence such as it is? Well, the government, if you look throughout the record, did not object to the defense raising this entire argument. Their theory of the case is that the ammunition was not real. That's not actually a defense. I thought the defense was not that the ammunition was not real. The defense was that you have not proven beyond a reasonable doubt that he knew it was real. Correct, Your Honor. That's right. But that's not actually a defense under 921 under the statute. And the reason for that, I think, is in the plain reading of the statute. The statute refers to ammunition, cartridge cases, primers, bullets, or propellant powder designed for use in any firearm. All of those things, with the exception of the first, the ammunition is the entire package, are components of ammunition. And therefore, under the statute, Mr. Grau, if you change the facts just a little bit, if he was in possession of just cartridge cases designed for use in any firearm, if he knowingly possessed those, he could potentially be charged under the statute. Right, but if he possessed something that he knew to be or that he believed to be a replica bullet, that's not covered by the statute. How do you say it is? Because I don't remember, I don't think I looked at what the government's requests to charge were, but the actual charge that was given certainly told the jury that this was a defense. It did tell them that, yes. So back to my original point, which was we did not seek to prevent the defense from providing any information about their defense that he believed it was a fake bullet. But we did draw lines around the point where they wanted to admit the paralegal because that was simply too far. And Judge Lynch, you talked about that before with the appellant. Introducing that evidence would have been sort of a rabbit hole. You're talking about an entirely different analysis from a witness who never had spoken to Mr. Grau, was not going to relay statements by Mr. Grau, as in the Scully case. Or, for example, in the Onanuma case, which was cited by the appellant. In that case, there were two differences. One was Onanuma had made a statement at the time of the arrest about the diamonds. It was about four days into his custody, I think. But he said to law enforcement, oh, that's heroin? They told me that I would get $5,000 if I smuggled these diamonds. So he had made that statement. There was some evidence in the record, at least, to support that theory. Secondly, Onanuma wanted to introduce an expert on diamonds. And, of course, an expert can rely on opinion, hearsay, information provided to them by lawyers. It's a much broader scope in terms of what they're allowed to testify about. Here, the defense wanted to introduce the paralegal testimony, which was limited only to what she had seen, heard, and did on Amazon. So, for those reasons, unless the court has any further questions, we ask that the verdict of the trial court be affirmed. Thank you, Mr. Pellegrino. Ms. Cassidy? I just have a few points. First, the government did not even object to the calling of the paralegal. The defense was just discussing scheduling with the judge, and the judge sua sponte rejected that testimony. The judge sua sponte ruled that that was irrelevant. Later, when defense counsel still argued that the bullets should nonetheless, the four bullets, Exhibit L, that had been shown to Agent Stern, the fake replica bullets ordered online, should be introduced, and the keychain, the court allowed the keychain, which was also bought by the paralegal online, but didn't allow the four replica bullets. Why? The only reason is that the government did not object to the keychain, and it objected to the four bullets. There was no reason given, but the four bullets were much, much more helpful to the defense. That seems to be the only discrimination between the keychain, which was a fob on a keychain that looked obviously fake, between that and the four replica bullets, which looked much more real. Well, I'm looking at it right now. I'm not so sure. To me, it seems it is debatable whether it's fake or not. It may well have started out as something real, and then somebody inserted the hook that then holds it onto the keychain. Also, the jury had no idea where this came from, because the paralegal wasn't allowed to testify. So what the jury did not have before it was the simple fact that this is a thing out there, that there are replica bullets, that they're on sale for very little money on Amazon, that they're available to anybody who wants them. So the fact that the fob in the bullet was out there was in evidence. Well, that was in evidence, but the jury had no idea where it came from, because the paralegal bought that also. It was tendered as fake. It was shown to the store detective, Kiridongo. But because it was going to be authenticated later through the paralegal, and that was not allowed, the jury didn't even have any idea where that came from. And that was also much, much less supportive of the defense because of the way it looked. On Agent Stern, Agent Stern testified that he didn't think this gun could fire anything. He didn't think it was real. And I think he even tried to fire it, tried to test it himself, sent it to the lab just to make sure. He testified that if you pulled the trigger, the bullet would just fall out. There was nothing even close to being operable here. And finally, on the Omanumu decision, there were two issues. One was the relevance, and one was whether the expert testimony was admissible under 702. On the relevance decision, the court's decision was based on the tendency of this evidence to show that basically this kind of diamond smuggling did exist. It was a thing. Just like here, we wanted to show that this kind of replica did exist, that it was out there. And that would have supported the defense. Thank you, Ms. Kastner. Thank you. Thank you both. We'll reserve decision.